**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

| | | |
|---|---|---|
| WALGREEN CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| PETER NEARY | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**COMPLAINT**

Plaintiff Walgreen Co. d/b/a Walgreens ("Walgreens") brings this action against Defendant Peter Neary ("Neary" or "Defendant"), alleging as follows:

## I.   INTRODUCTION

1.      This is a civil action seeking compensatory and exemplary damages, attorneys' fees and costs, and equitable relief arising out of Defendant's repeated and intentional use of Walgreens; stolen trade secrets and other proprietary information (in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 and other claims), as well as Defendant's tortious interference with Walgreens' contractual and business relationships.

2.      The Defendant is a substantial investor in L2 Partners LLC ("L2").

3.      L2 is a real estate investment company that buys and sells commercial properties (including Walgreens-leased properties).  L2 acquires these properties on its own and on behalf of individual investors, such as Defendant, who retain L2 to provide information regarding potential property purchases and assistance in acquiring properties.  As set forth herein, since at least January 2019, L2 and its investors, including Defendant, have engaged in a scheme to enrich themselves at Walgreens' expense by buying and selling Walgreens-leased properties (or

1

"Walgreens Properties") and interfering with Walgreens' contractual rights of first refusal ("ROFR") for the purchase of these properties—a standard term in Walgreens' lease agreements.

4.      Defendant and L2 carried out this scheme in large part through the misappropriation of Walgreens' trade secrets and confidential information, including actual store-performance data (profit, prescriptions per day, total sales, etc.) for every single Walgreens store in the United States. Defendant illegally acquired such information from former Walgreens employees, including Aaron Peters ("Peters"), a former Senior Director of Walgreens' Market Planning and Research Department. In the months before leaving Walgreens to join L2, Peters knowingly stole tens of thousands of sensitive Walgreens files that he later disclosed to L2 (collectively, the "Illegally Obtained Data").

5.      Through the misappropriation of the Illegally Obtained Data, L2 was able to identify and target high-performing Walgreens Properties that met specific investment criteria set by each investor, including Defendant. L2 then shared this information with brokers who, on behalf of L2 and its investors (including Defendant) convinced landlords to sell Walgreens Properties to L2 and its investors in a manner designed to interfere with Walgreens' ROFR. L2 also shared this information with its investors, including Defendant, who then used the information to decide whether to purchase particular Walgreens Properties. Using and relying on the Illegally Obtained Data, Defendant purchased at least two Walgreens Properties through single-purpose entities which were owned and controlled by Defendant (the "Investor Entities"). Defendant's conduct amounts to criminal theft of Walgreens' trade secrets in violation of the federal Defend Trade Secrets Act, various state trade secrets misappropriation statutes, and conversion.

6.      However, Defendant was not content with the unlawful advantage seized through the Illegally Obtained Data. Defendant therefore sought to tortiously interfere with Walgreens'

2

ROFR.  To that end, on behalf of the investors, including Defendant, L2 and various brokers reached out to Walgreens' landlords and proposed inordinately high purchase prices that the landlords would partially refund at closing ("Partial Refunds").  The Partial Refunds would appear in secret "side agreements" that were deliberately concealed from Walgreens – even though the ROFR provisions in Walgreens' leases required disclosure of all terms and conditions for the proposed purchase of Walgreens Properties.  On behalf of Defendant, L2 would then prepare notices of the sale to send to Walgreens pursuant to the ROFR provisions of the applicable leases ("ROFR Notices") that intentionally omitted the Partial Refunds, thus fraudulently concealing the terms of the Partial Refund side deals from Walgreens.  By concealing the Partial Refunds, L2 and Defendant artificially inflated the purchase prices represented to Walgreens, preventing Walgreens from exercising its ROFR and purchasing the property on the same terms as those provided in the bona fide offer.  But for L2 and Defendant's fraudulent ROFR Notices, Walgreens would have exercised its ROFR with respect to the Walgreens Properties.

7.      By misappropriating Walgreens' trade secrets and by tortiously interfering with Walgreens' contractual rights, Defendant was able to illegally acquire at least $6,662,400 worth of Walgreens Properties while preventing Walgreens from exercising its ROFR with respect to the properties between 2019 and 2021 alone, which Walgreens estimates caused damages in excess of $1,200,000.

## II.   THE PARTIES

8.      Plaintiff Walgreens is an Illinois Corporation with its principal place of business in Deerfield, Illinois.

9.     Defendant is an individual who retained L2 to provide Illegally Obtained Data regarding Walgreens and assistance in acquiring numerous Walgreens Properties.  Defendant resides in Florida and may be found at his residence located at 4730 N. Bay Rd, Miami, FL 33140.

### III.   JURISDICTION AND VENUE

10.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this is a civil action arising under the Defend Trade Secrets Act.

11.     This Court also has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as it is between citizens of different states and the amount in controversy exceeds $75,000.

12.     This Court has personal jurisdiction over the Defendant who resides and does business in Florida.

13.     Venue is likewise proper in this judicial district pursuant to 28 U.S.C. § 1391, because, as alleged above, this judicial district is where the Defendant resides.

### IV.   FACTUAL BACKGROUND

14.     L2 was formed on October 14, 2013.  L2 is a commercial real estate investment company that purchases retail properties—including properties owned or leased by Kroger, Publix, CVS, Hy-Vee, and Rite Aid—but primarily acquires Walgreens Properties.

15.     L2 purchases properties on its own or on behalf of its investors, including Defendant.  Defendant retained L2 pursuant to consulting agreements (the "Consulting Agreements") that authorize L2 to search for Walgreens Properties that match the criteria for investment set by each investor.  The Consulting Agreements expressly state that L2 will "provide the Client with certain information specific to WALGREENS locations[,]" and identify "one or more choices" that match the Client's criteria, and will then "negotiate acquisition for the Client's

purchase of specific WALGREENS location (s) with current location owners under such terms and conditions directed by the Client[.]"  (Consulting Agreement Exemplar, attached hereto as Exhibit 1).  For each property that L2 purchased on behalf of an investor (such as Defendant), L2 organized an Investor Entity as a single-purpose investment vehicle to take title to the property. L2 would then assign the Purchase and Sale Agreement for purchase of the property to that Investor Entity.

16.     Walgreens Properties are valuable investment commodities because they provide landlords with a predictable source of long-term income—namely, rent from Walgreens.  The value of a Walgreens Property is largely dependent on whether Walgreens intends to renew its lease at that location and continue paying rent which is an internal decision made by Walgreens based on the individual store's performance.  Thus, identifying store performance is critical to successful investment, as it is a strong indicator as to whether Walgreens will continue to lease a particular property and pay rent to the landlord, and whether it may exercise its ROFR for a given property.

17.     As shown herein, Defendant used a combination of both misappropriation of Walgreens' trade secrets, fraud, and tortious interference with Walgreens' contracts with landlords to prevent Walgreens from exercising its ROFR and capturing the value of those Walgreens Properties.  Through these wrongful actions, between 2019 and 2021 alone, Defendant acquired at least $6,662,400 worth of Walgreens Properties while preventing Walgreens from exercising its ROFR with respect to such properties, which Walgreens estimates caused damages in excess of $1,200,000.

18.     As part of the scheme, investors, including Defendant, provided L2 with specific criteria for the Walgreens Properties they were interested in acquiring.  L2 then, on behalf of the

investors, including Defendant, used the Illegally Obtained Data to identify high-performing Walgreens Properties that met the investor's criteria and compared them with properties on the market and/or reached out to current owners of the properties to convince them to sell. After identifying the properties, L2 then prepared "pitch-decks" using and containing the Illegally Obtained Data to describe the Walgreens Properties' investment potential to its investors, including Defendant. Defendant then reviewed the pitch-decks and discussed the Walgreens Properties with L2. Defendant decided whether he wanted to purchase the properties and set the terms for those purchases.

19.     Defendant is highly experienced in such real estate transactions. As a result, Defendant knew or should have known that the information disclosed in the pitch-decks about the Walgreens Properties was not publicly available and contained Illegally Obtained Data. Additionally, upon information and belief, L2 specifically informed Defendant during these pitch-deck meetings that the information was illicitly obtained through the misappropriation of Walgreens' trade secrets. Indeed, L2 routinely used its illicit access to Walgreens' data and information as a selling point for its services.

20.     If Defendant approved a purchase, L2 acquired the Walgreens Property on behalf of Defendant. This entailed a concerted effort to prevent Walgreens from exercising its ROFR by negotiating inflated purchase prices with the landlord, withholding material details of the transaction from Walgreens, and preparing fraudulent ROFR Notices.

21.     Additionally, on behalf of both L2 and Defendant, brokers used the Illegally Obtained Data to advertise investor-owned properties to third parties and obtain a more favorable deal on those properties.

22.     The repeated misappropriation of Walgreens' trade secrets and tortious interference with its contracts were only interrupted when Walgreens discovered the trade secret theft after initiating suit against L2 in 2021. *Walgreens v. L2 Partners, LLC, et al.*, 21CV-50235, Franklin County, Tennessee (the "Franklin Action").[1]

23.     By misappropriating Walgreens' trade secrets and/or tortiously interfering with Walgreens' leases, Defendant has wrongfully acquired at least the following properties:

| ROFR Notice Date | Store # | Address | ROFR Notice Purchase price |
|---|---|---|---|
| 2019.02.08 | 3542 | 1607 N. Zaragoza Rd., El Paso, TX | $2,850,000 |
| 2020.06.26 | 5459 | 9909 W Loomis Rd, Franklin, WI | $3,812,400 |
| Total: | | | $6,662,400 |

(Hereinafter, "Figure 1").

24.     Upon information and belief, Defendant was involved in purchasing other Walgreens Properties using the Illegally Obtained Data.

**A. Trade Secret Theft**

> *a. Peters' Tenure at Walgreens*

25.     Defendant's theft and misappropriation of Walgreens' trade secrets were facilitated, in part, by Peters' theft of the Illegally Obtained Data.

26.     Peters was a Walgreens employee from 2003 until December 6, 2019. At the time of his departure, Peters was a Senior Director of Walgreens' Market Planning and Research Department ("MPR Department") with an annual salary well into the six figures. In 2019, Peters managed at least twenty (20) Walgreens employees who reported to him.

---

[1] Walgreens is pursuing a separate action against the other parties involved in the misappropriation of its trade secrets. *See Walgreen Co. v. Aaron Peters et al.*, No. 1:21-cv-02522 (N.D. Ill.). Defendant was dismissed from that action without prejudice after claiming that the court lacked personal jurisdiction over him.

27.     As Senior Director, Peters helped manage Walgreens' MPR Department and was intimately involved in all aspects of Walgreens' market planning and research, and in Walgreens' decision-making regarding commercial real estate nationwide.  Walgreens entrusted Peters with access to raw confidential and proprietary data that Walgreens and Peters could and did use to analyze, track, predict, and make recommendations based on the performance of every Walgreens store nationwide including, without limitation, information concerning sales, lease terms, operations, adjusted operating income and cash flow, as well as sales reports, dashboards, and spreadsheets compiling this data.  The confidential information and documents Peters had access to were often referenced in his emails and used in Walgreens' strategy decisions.  These decisions involved mergers and acquisitions, growth potential for existing store locations, lease terms and extensions, and identifying potential new markets or new store locations.

28.     Peters also used this information to advise Walgreens' real estate decisions, including its decision to exercise or waive ROFR with respect to commercial properties leased by Walgreens that were put up for sale by the landlord owners.  For example, Peters would review confidential information available to the MPR Department and, using certain confidential and proprietary metrics, make recommendations in favor of or against Walgreens' exercise of its ROFR.  Peters further had the duty and authority to designate matters as confidential.

29.     Walgreens provided Peters with a Walgreens-owned laptop (the "Computer") for his employment, which Peters used to access Walgreens' confidential and proprietary data and communicate concerning Walgreens' marketing decisions and real estate transactions throughout the United States.  To safeguard its confidential information, Walgreens adopted multiple policies regarding its employees' access and use of confidential data and information technology.

30. For example, Walgreens adopted the "Protection of Confidential Information Policy" on or about April 29, 2010, which provides as follows:

**Purpose**

. . .

The purpose of this policy is to protect Confidential Information from disclosure or use outside Walgreens or for personal gain, either during or after employment, without proper authorization to do so.
. . .

**Policy**

Confidential Information [defined to include but not be limited to business plans and strategies, financial data, and research and development] should be used by team members only for legitimate Walgreen business purposes in accordance with contractual and/or legal requirements, and should only be disclosed **within Walgreens** to those team members who have a legitimate business **need to know** such information. . . . Confidential Information should never be used or disclosed for any non-Walgreen business purpose, either during or after your employment with the Company.

. . .

Violations of this policy regarding Protection of Confidential Information may violate the law and can lead to legal and disciplinary action, including the possibility of immediate termination of employment.

(the "Confidentiality Policy"). (Confidentiality Policy, attached hereto as Exhibit 2.)

31. Additionally, Walgreens has had a "Global End User Security Policy" since at least December 10, 2018, which provides in relevant part:

**3.1 Acceptable use**
. . .
WBA [Walgreens Boots Alliance, defined to include Walgreens] information must not be sent or transferred to:
• unauthorized individuals or organizations,
• any online storage site which is not an approved WBA storage solution,
• any personal email accounts.

9

WBA owned computing devices (such as laptops, desktops, mobile devices), applications (such as business applications, intranet applications, email applications, instant messaging applications), communication systems (such as voice and conferencing), and network resources, (including access to the Internet and other on-line resources), are provided by WBA for the use of its employees and authorized third-parties for business purposes. These systems, devices, applications and networks are the property of WBA and must be used in accordance with WBA policies, professional standards, as well as laws and regulations.

. . .

### 3.5 Device management

WBA systems and information may only be accessed by authorized devices, such as:
• WBA owned desktop and laptop computers or authorized personal laptops/computers,
• WBA owned telephones,
• WBA owned or authorized storage media,
• WBA owned or authorized smart phones and tablets including personal devices authorized by IT Leadership.

. . .

In addition, WBA end users leaving the Company must return all WBA owned equipment and electronic and non-electronic data to their line managers.

. . .

### 3.7 Data storage

WBA end users must only store WBA information on devices authorized by WBA. The following external storage devices/mechanisms are prohibited without approval from the end user's manager AND IT Leadership or designee which will only be given for exceptional circumstances:
• External storage devices such as flash drives and external hard drives;
• CDs/DVDs;
• Internal and external websites; or
• Any other external storage media not listed above.

### 3.8 Disclosure of Confidential Information and data transfer

WBA end users are prohibited from disclosing, storing, or transmitting Confidential Information to anyone internal or external, who is not authorized to receive the information. Confidential Information is information that WBA has a legal, regulatory or contractual obligation to protect, or, where unauthorized disclosure, compromise, or destruction could result in severe damage, or could

> have a serious adverse financial and/or reputational impact on WBA, or provide significant advantages to a competitor.
> . . .
> In the event Confidential Information must be shared with external users or third-parties, the sender must validate the following:
> • All recipients are authorized,
> • The data is encrypted during transmission, and
> • A current, executed Non-Disclosure Agreement ("NDA") or appropriate contracts requiring confidentiality maintained with the external users or third-parties is on file.

(the "Security Policy").[2] (Security Policy, attached hereto as Exhibit 3.)

32.    Peters reviewed and acknowledged Walgreens' Confidentiality and Security Policies on March 21, 2018 and again on March 26, 2019.

33.    The MPR Department, including Peters, also received annual training and information from Walgreens' legal and/or compliance teams regarding confidentiality and the importance of protecting Walgreens' trade secrets.

34.    Peters was well aware of Walgreens' policies regarding the need to protect the confidentiality of its trade secrets.  During multiple employee evaluations, Peters acknowledged that a critical aspect of his job was keeping this information confidential, stating he had "gone above and beyond to continually stress the importance of not sharing confidential data with the wrong people and have ensured that potentially proprietary information has remained in safe keeping" and that he had been "involved with a lot of proprietary/confidential information and ha[d] refrained from sharing anything inappropriate."

35.    One particularly sensitive document that Peters was given access to was the Trailing Twelve-Month Report (the "TTM Report"), which contains the total sales, itemized

---

[2] The Security Policy was amended and updated on or about October 4, 2019, but the provisions quoted above did not change from the December 2018 version.

prescription sales, profit margins, operating expenses, and adjusted operating income for every individual Walgreens store in the United States.

b. *Peters' Theft of Walgreens Data*

36.     In early November 2019, Peters accepted a position with L2.  Thereafter, until his last day at Walgreens, December 6, 2019, Peters surreptitiously downloaded large quantities of Walgreens data using a Walgreens' Computer, an unauthorized external hard drive, and possibly other devices.  Peters downloaded the Illegally Obtained Data—more than 30,000 emails and documents, including the highly sensitive TTM Report—directly to his personal hard drive.

37.     The Illegally Obtained Data contains highly sensitive, proprietary, and commercial information.  For example, the TTM Report contains information regarding the adjusted operating income ("AOI") of Walgreens' individual stores.  AOI basically represents a store's total profits, which are calculated by deducting costs and operating expenses from the store's total sales.  AOI is one of the primary factors in assessing Walgreens store performance and is a trade secret.  Each document containing the AOI is likewise a trade secret because it compiles business and financial information into one place where it can be conveniently accessed.  This information is competitively sensitive and not publicly available.  Moreover, Walgreens only permits access to a limited number of employees who have a "need to know" such information.  Those employees are bound by Walgreens' Policies and may only access this information for Walgreens-related purposes.

38.     Walgreens uses AOI in interstate commerce to analyze its market position and make business decisions, including whether to exercise its ROFR and purchase Walgreens Properties nationwide.  AOI also informs larger strategic decisions, like mergers and acquisitions, identifying new markets, and an individual store's future growth potential.  AOI is valuable because it is not generally known to, and not readily ascertainable by, others who could obtain

economic value from it.  If Walgreens' competitors knew the profitability of various Walgreens Properties, they could use that information to identify where to place (or to not place) competing businesses.  Additionally, if a third party, like L2 or Defendant, obtained Walgreens' AOI data, the data could be used to identify high-performing Walgreens Properties and determine the likely price that Walgreens would pay to exercise its ROFR and purchase those properties.

39.     The Illegally Obtained Data also includes details of the process by which Walgreens determines whether to exercise its ROFR and analyzes lease terms, including without limitation whether and when to negotiate lease extensions.  This information would therefore allow a third party, such as L2 or Defendant, to structure its offers to purchase Walgreens Properties in a manner that would prevent Walgreens from exercising its ROFR with respect to such properties.

### c. *Defendant Acquires and Misappropriates the Illegally Obtained Data*

40.     Upon information and belief, L2 knew Peters had taken the Illegally Obtained Data. L2 and its investors, including Defendant, have since used the Illegally Obtained Data to acquire numerous high-performing Walgreens Properties and structure purchase offers in a way that would effectively deprive Walgreens of exercising its ROFR.

#### i.     Peters Discloses, and L2 Agrees to Use, the Illegally Obtained Data

41.     L2 assigned Peters to its Acquisition Team, which is led by Dan Marotta and Jeff Richards and is responsible for identifying high-performing Walgreens Properties for L2 to target.

42.     L2 was aware that it had no right to use the Illegally Obtained Data but took no steps to return it to Walgreens.  L2, along with its brokers, then used this Illegally Obtained Data to obtain high-performing Walgreens Properties on behalf of its investors.

43.     In addition to disclosing the Illegally Obtained Data, between December 7, 2019 and May 5, 2021—while employed by L2—Peters improperly accessed Walgreens' online portal

(the "Portal") to obtain data concerning various Walgreens stores on fifty-three separate occasions. Once it discovered the unauthorized access, Walgreens terminated Peters' Portal account.

44.     L2 has since used the Illegally Obtained Data as part of its standard market research in identifying properties for its investors.  L2 has provided the Illegally Obtained Data to its investors, including Defendant, to allow them to determine whether they have an interest in purchasing those Walgreens Properties and on what terms.  By accepting the benefits of Peters' misconduct and using it in property analyses, Defendant knowingly ratified and leveraged off of Peters' theft.

ii.     L2 and Defendant Implement the Trade Secret Scheme

45.     Beginning in or around December 2019, L2 used and disclosed the Illegally Obtained Data extensively.  L2 used the Illegally Obtained Data to identify high-performing Walgreens Properties that matched criteria set by each investor, including Defendant.  Each investor, including Defendant, used the Illegally Obtained Data, which he knew or should have known was illegally obtained, to approve those acquisitions and the terms of the purchase for each of the targeted Walgreens Properties.

1.     **L2 and Defendant Use the Illegally Obtained Data to Target Walgreens Properties**

46.     L2 and its investors, including Defendant, repeatedly used the Illegally Obtained Data to identify and acquire high-performing Walgreens Properties.

47.     The Illegally Obtained Data allowed L2 to quickly identify the performance of every single Walgreens store in the United States on behalf of its investors.  Defendant provided L2 with certain criteria he was looking for in acquiring Walgreens Properties.  L2 then used the Illegally Obtained Data to target Walgreens Properties that best fit Defendant's criteria.  Without

14

the Illegally Obtained Data, L2 would not have a reliable process for identifying the highest-performing Walgreens stores for Defendant or for evaluating offers provided by brokers.

48.    L2 used the Illegally Obtained Data to prepared lists of valuable Walgreens Properties that were not on the market and, acting through its brokers, sought to convince Walgreens' landlords to sell those properties to its investors.  Using the Illegally Obtained Data, L2 provided target lists to its brokers.  Those brokers then used the target lists to focus their efforts on the properties that met each investor's – including Defendant's – criteria.

49.    L2 also used the Illegally Obtained Data to reevaluate Walgreens Properties that it had previously attempted – but failed – to purchase for its investors before hiring Peters.  Using the Illegally Obtained Data, L2 identified which stores matched Defendant's criteria and which stores were worth a second look.

50.    L2 also used the Illegally Obtained Data to evaluate the offers it received from brokers.  Before deciding whether to propose purchase of the property to its investors, including Defendant, L2 used the information contained in the highly sensitive TTM Report to assess the store's performance.  L2 did so with the clear purpose of ensuring that the property would be a good investment for the investors, including Defendant.  L2 could not have determined how well a Walgreens Property was performing without having access to the Illegally Obtained Data.

51.    L2 and its investors further used the Illegally Obtained Data to determine the optimum purchase price for Walgreens Properties, which L2 and Defendant used to prevent Walgreens from exercising its ROFR.  Specifically, L2 and its investors, including Defendant, would choose a price based on the Illegally Obtained Data that they knew was just high enough that Walgreens would not exercise its ROFR.  For several different Walgreens Properties, the purchase price set by L2 and its investors was, on average, slightly less than 10% higher than

Walgreens' internal metrics valued the property.  L2 was able to calculate these purchase prices by using the Illegally Obtained Data.  Thus, by using the Illegally Obtained Data, L2 was able to price Walgreens out of these transactions, thereby effectively depriving Walgreens of its ROFR.

52.    Finally, upon information and belief, L2 also used the Illegally Obtained Data to advertise Walgreens Properties owned by investors, including by Defendant, to third parties.

### 2. L2 Uses the Illegally Obtained Data to Solicit and Include Defendant in the Scheme

53.    L2 used the Illegally Obtained Data to purchase Walgreens Properties on behalf of Defendant.  Those investors retained L2 specifically to locate and acquire Walgreens Properties with the Illegally Obtained Data.

54.    In the course of this work, L2 used the Illegally Obtained Data to create "site specific reports" in the form of pitch-decks for its investors, including Defendant, describing the potential investment value of particular Walgreens Properties.  Each pitch-deck contained a financial summary, which identified that store's profit, total sales, the number of prescriptions sold each day, and a statement of that store's ranking when compared to all Walgreens locations nationwide—none of which is publicly available.

55.    L2 prepared the pitch-decks provided to Defendant and included the Illegally Obtained Data to describe the store's performance.

56.    After reviewing the information contained therein, L2 used the pitch-deck to advertise the Walgreens Property to its investors, including Defendant.  Given his sophistication, Defendant was aware that this kind of information was not publicly available.  Thus, Defendant knew that this information was derived from the Illegally Obtained Data.

57.    If the investor was interested, L2 would set up a pitch-deck meeting where they would discuss the Walgreens store's performance and the terms of purchase.  Upon information

and belief, during these pitch-deck meetings, L2 informed each investor, including Defendant, about the Illegally Obtained Data.

58.     Using the Illegally Obtained Data, L2 consistently identified the strongest performing stores and made unconditional guarantees about their future performance.  For example, L2 was able to target high-performing Walgreens Properties that only had a few years remaining on their respective leases.  Generally, a commercial property is less valuable to potential buyers where there is an existing lease on the property that is about to expire.  Because it had access to the Illegally Obtained Data, however, L2 was able to easily determine whether Walgreens was likely to extend any particular lease.  Thus, relying on the Illegally Obtained Data, L2 frequently guaranteed that if Walgreens did not renew its lease, L2 would refund its consultation fee.  This kind of guarantee would have been unacceptably risky had L2 not known whether Walgreens would extend a lease.  L2 would not have made such a guarantee without access to the Illegally Obtained Data.  Defendant is a highly sophisticated businessman, with significant experience in purchasing commercial real estate and either knew or should have known that such a guarantee was highly unusual.  Based on his sophistication, he either knew or should have known that L2 had access to stolen data in order to offer these guarantees.

### 3.  Defendant Misappropriates the Illegally Obtained Data

59.     Defendant reviewed the pitch-decks and the Illegally Obtained Data provided to him by L2 to evaluate whether he wanted to purchase particular Walgreens Properties.  After reviewing the pitch-deck and speaking to L2, if Defendant then decided that the Walgreens Property and terms of purchase met his criteria, Defendant would retain L2 pursuant to a Consulting Agreement.  L2's standard Consulting Agreement contained the following terms:

> **Scope of Work**. The Client hereby acknowledges that it has independently confirmed and expressly acknowledges the Consultant's experience and expertise

specific to the transaction of WALGREENS stores. In consonance therewith, **the Consultant agrees to provide the Client with certain information specific to WALGREENS locations** that is solely intended to aid the client with its acquisition decision-making. The Consultant's service may include but shall not be limited to: (i) **consulting with Client regarding the acquisition of specific existing WALGREENS locations and/or any preferred location identified by the Client**; (ii) **providing site specific reports including pictorial and demographic information**; (iii) **conducting a search of available WALGREENS locations to obtain one or more choices that match the Client's criteria**; (iv) **assist in the preparation of appropriate acquisition specific documentation**; (v) **negotiate acquisition for the Client's purchase of specific WALGREENS location(s) with current location owners under such terms and conditions directed by the Client**; (vi) **assist in the closing of the WALGREENS transaction**.

(Ex. __, Consulting Agreement Exemplar (Emphasis added)).

60.     Each investor signed similarly worded Consulting Agreements as a routine practice for each Walgreens-leased property they purchased through L2.  Upon information and belief, Defendant signed at least two (2) such Consulting Agreements.

61.     Upon information and belief, Defendant retained L2 for several properties, two (2) of which are identified in Figure 1.

62.     After each investor executed the Consulting Agreement, L2 organized an Investor Entity, prepared an operating agreement on behalf each investor, and appointed the investor as sole member of the Investor Entity.

63.     In return for L2's services, each investor, including Defendant, paid L2 a flat rate of $150,000 for a property with a purchase price of up to $3,000,000, and 4.5% of the purchase price exceeding that amount.

64.     By executing the Consulting Agreements, Defendant explicitly authorized L2 to provide him with Walgreens' information (including the Illegally Obtained Data) and to search for and provide information regarding additional Walgreens Properties that matched his criteria.  For each investor, including Defendant, the L2 Acquisition Team used the Illegally Obtained Data to

18

identify specific Walgreens Properties, specifically discussing whether that property matched the investor's criteria.  L2 misappropriated and used the Illegally Obtained Data in the course of the very business that Defendant retained L2 to perform.  Defendant in turn relied upon and used the Illegally Obtained Data in making his decisions about whether to purchase a Walgreens Property and on what terms.  Moreover, L2 acted on Defendant's behalf and pursuant to Defendant's express direction and control.  Therefore, Defendant is both directly and vicariously liable for L2's misappropriation of Walgreens' trade secrets.

65.     As set forth in detail above, Defendant was fully aware that the Illegally Obtained Data was stolen from Walgreens.

66.     Defendant misappropriated Walgreens' trade secrets (including those contained in the pitch-decks) by using that information to, among other things, (a) evaluate the potential purchase of Walgreens Properties, (b) determine the value of Walgreens Properties, and (c) decide to purchase Walgreens Properties at particular prices.

**B. The Partial Refunds and Interference With Walgreens' ROFR**

67.     Not satisfied with the unlawful advantage he acquired with the Illegally Obtained Data, Defendant sought to prevent Walgreens from exercising its ROFR with respect to targeted Walgreens Properties.  To that end, Walgreens' typical ROFR requires that, before a landlord may accept a third-party offer to purchase a Walgreens Property (the "Bona Fide Offer"), Walgreens is entitled to notice and a copy of the Bona Fide Offer, and an opportunity to purchase the property on those same terms.

68.     Defendant sought to prevent Walgreens from exercising its ROFR by misrepresenting the purchase price shown in the ROFR Notices that were later provided to Walgreens.  Walgreens' leases generally require the landlord to provide *all* terms and conditions

of any third party offer to purchase the leased property as part of the ROFR notice the landlord was required to provide to Walgreens. Upon information and belief, Defendant was given a copy of each Walgreens lease when purchasing a property and therefore knew or should have known of Walgreens' ROFR. Nonetheless, L2, along with its brokers and Defendant, pressured landlords to violate these contractual obligations to Walgreens.

### a. *Acquiring Properties Through Partial Refund Scheme*

69.     For at least the properties identified below, L2 and Defendant implemented a scheme whereby L2 would negotiate with landlords on Defendant's behalf and for grossly inflated purchase prices for the properties, but with side agreements in place that required the landlords to refund a significant amount of the purchase amounts to Defendant's Investor Entities at closing (defined above as the "Partial Refund"). These side agreements were concealed from and never disclosed to Walgreens as part of any ROFR Notice from the landlords or otherwise. The objective of the scheme was to fraudulently represent fake purchase prices for these properties to Walgreens that were high enough to deter Walgreens from purchasing the properties through the exercise of its ROFR with respect thereto

70.     L2 and Defendant's entire purpose in offering the Partial Refunds for these properties was to deceive Walgreens into believing that the purchase prices were higher than what L2 and Defendant actually agreed to pay. Thus, L2, or its brokers, asked landlords to conceal the Partial Refunds from Walgreens and delay executing agreements for the Partial Refunds until after Walgreens' ROFR periods for the properties expired.

71.     As part of this scheme, L2 prepared ROFR Notices for the properties, intentionally omitting the Partial Refund terms, knowing the ROFR Notices would be the only source of information Walgreens would be provided regarding the "Bona Fide Offer" for the properties and

20

that the ROFR provisions of Walgreens' leases required that <u>all</u> material terms of any proposed purchase of the properties needed to be disclosed to Walgreens.  Based on the terms of the Consulting Agreements, L2 informed Defendant (1) that the purchase prices were artificially inflated, (2) that the ROFR Notices would be submitted to Walgreens with these fake prices, and (3) that the purpose of the Partial Refund side agreements was to defraud Walgreens into not exercising its ROFR.

72.     To conceal its true purpose, L2 framed the Partial Refunds as a maintenance credit, even though the condition of the properties had nothing to do with the size of the Partial Refunds.

73.     The Partial Refunds were ultimately paid to Defendant's Investor Entities.    In carrying out the Partial Refund scheme, L2 was acting on behalf of Defendant pursuant to its authority under the Consulting Agreement by "negotiat[ing] acquisition for the Client's purchase of specific WALGREENS location (s) under such terms and conditions **directed by the Client**[.]" (Ex.__1, Consulting Agreement (emphasis added)).

74.     L2 further informed Defendant of the Partial Refund terms through pitch-decks before closing on the properties.  Defendant was likewise aware that, while ostensibly for repairs, the Partial Refunds had no connection to the actual condition of the Walgreens Properties.  Indeed, the pitch-decks Peters prepared made no mention that the properties needed maintenance.  Instead, the pitch-decks described the Partial Refunds as discounts to the purchase prices for the properties.

75.     Defendant knowingly granted L2 authority to negotiate these Partial Refunds and ultimately received the Partial Refunds for the properties where L2 and Defendant executed this Partial Refund scheme.  Defendant purchased at least two (2) properties using this Partial Refund scheme.

76.     Defendant had actual knowledge that the Partial Refund terms were omitted from the ROFR Notices provided to Walgreens.  Further, given that L2 had a contractual obligation to convey all terms of the acquisition for Defendant's approval, L2 informed Defendant that the Partial Refund terms were omitted from the ROFR Notices during their pitch-deck meetings (or otherwise).

77.     Nevertheless, before closing, Defendant authorized L2's fraudulent Partial Refunds, furthering their shared goal of acquiring Walgreens Properties and depriving Walgreens of its ROFR with respect thereto.

78.     In addition to using Walgreens' trade secrets and confidential information, Defendant was able use Partial Refunds to acquire at least the following Walgreens Properties:

- Store No. 3542, 1607 N. Zaragoza Rd., El Paso, TX (the "El Paso Property"); and

- Store No. 5459, 9909 Loomis Rd., Franklin, WI (the "Loomis Property").

These transactions are described in more detail below.

i.     The El Paso Property

79.     Upon information and belief, L2 began negotiations to purchase the El Paso Property from SRGS LLC ("SRGS") in or around January 2019.  L2's broker and SRGS's representative were at all relevant times located in Illinois and California, respectively.  All negotiations for the purchase of the El Paso Property by L2 were conducted on behalf of Defendant.

80.     Before February 8, 2019, L2 bargained, on behalf of Defendant, to purchase the El Paso Property for $2,850,000.  As part of this negotiation, L2 bargained for a $150,000 Partial Refund from SRGS to Defendant at closing, but Defendant ultimately received $75,000.

81.     On February 15, 2019, Walgreens received a ROFR Notice for the El Paso Property.  The ROFR Notice, dated February 8, 2019, and executed by L2, identified a purchase

price of $2,850,000 for the El Paso Property, but did not include any terms relating to the Partial Refund.

82.     L2 drafted the material terms of the El Paso Property ROFR Notice and intentionally omitted the Partial Refund.  By omitting the Partial Refund with knowledge that the fraudulent ROFR Notice would be provided to Walgreens by the landlord and represented to include the complete and full terms of a "Bona Fide Offer" for the property, L2, as agent of Defendant, acted with the specific intent to defraud Walgreens and prevent Walgreens from exercising its ROFR against an artificially high purchase price.

83.     When L2 prepared the ROFR Notice at the direction of Defendant, it (1) knew the statements contained therein, specifically regarding the purchase price, were false; (2) knew that the ROFR Notice would be submitted to Walgreens, as was required by the ROFR provision of the lease; (3) intended for Walgreens to rely on the ROFR Notice in determining whether to exercise its ROFR for the property; and (4) intended to defraud Walgreens into waiving or declining to exercise its ROFR.

84.     Based on the terms of the Consulting Agreement with Defendant, L2 informed Defendant (1) that the purchase price was artificially inflated, (2) that the ROFR Notice would be submitted to Walgreens with this false price, and (3) that the purpose of the Partial Refund was to defraud Walgreens into waiving or declining to exercise its ROFR.  Nevertheless, upon information and belief, Defendant executed the Consulting Agreement and approved the terms of the El Paso Property acquisition.  Moreover, Defendant authorized, ratified, and became a party to L2's scheme to defraud Walgreens out of its ROFR with respect to the property.

85.     Based on the representations in the ROFR Notice, Walgreens, acting in good faith and exercising its business judgment, decided to not exercise its ROFR.  Walgreens reasonably

relied on the terms of the ROFR Notice that were presented to it as a Bona Fide Offer in determining whether to exercise its ROFR for the property.

86.     The Partial Refund was ultimately paid to an Investor Entity owned by Defendant, upon whose behalf L2 negotiated acquisition of the El Paso Property, including the receipt of the Partial Refund and concealing the same from Walgreens.

87.     As a result of the undisclosed Partial Refund, L2 was able to purchase the El Paso Property on behalf of Defendant for $2,775,000—$75,000 less than what was advertised to Walgreens in the ROFR Notice.  Walgreens reasonably relied on the fraudulent ROFR Notice and therefore did not exercise its ROFR for the El Paso Property.

88.     But for Defendant and L2's fraudulent statements in the ROFR Notice, Walgreens would have exercised its ROFR.

ii.   The Loomis Property

89.     L2 began negotiations to purchase the Loomis Property from Franklin WG, LLC, in or around June 2020.  Doug Holder, one of L2's other investors, was manager and sole member of Franklin WG, LLC.  L2 negotiated the sale between its investors, and on June 26, 2020, Doug Holder agreed to sell the Loomis Property to Defendant for $3,812,400 and issue Defendant a $181,542 Partial Refund at closing.

90.     On June 27, 2020, Walgreens received a ROFR Notice for the Loomis Property. The ROFR Notice, dated June 26, 2020, stated the purchase price for the Loomis Property as $3,812,400.  The Loomis Property ROFR Notice omitted the $181,542 refund that Defendant would receive at closing.  (*Id.*).

91.     L2 drafted the material terms of the Loomis Property ROFR Notice.  L2 intentionally omitted the $181,542 refund, concealing the same from Walgreens, with the specific

intent to artificially inflate the purchase price for the Loomis Property and prevent Walgreens from exercising its ROFR.  When L2 prepared the ROFR Notice, it: (1) knew the statements contained therein, specifically regarding the purchase price, were false; (2) knew that the ROFR Notice would be submitted to Walgreens as was required by the ROFR provision of the lease; (3) intended for Walgreens to rely on the ROFR Notice in determining whether to exercise the ROFR for the property; and (4) intended to defraud Walgreens into waiving or declining to exercise its ROFR.

92.    Based on the terms of the Consulting Agreement with Defendant, L2 informed Defendant (1) that the purchase price was artificially inflated, (2) that the ROFR Notice would be submitted to Walgreens with this false price, and (3) that the purpose of the Partial Refund was to defraud Walgreens into waiving or declining to exercise its ROFR.  Nevertheless, upon information and belief, Defendant executed the Consulting Agreement and approved the terms of the Loomis Property acquisition.  Moreover, Defendant authorized, ratified, and became a party to L2's scheme to defraud Walgreens out of its ROFR with respect to the property.

93.    Based on the language as represented in the ROFR Notice, Walgreens, acting in good faith and exercising its business judgment, decided to not exercise its ROFR.  Walgreens reasonably relied on the terms of the ROFR Notice that were presented to it as a Bona Fide Offer in determining whether to exercise its ROFR for the property.

94.    On July 22, 2020, prior to closing, L2 organized 9909 Franklin WI, LLC as an Investor Entity, with Defendant as a member.  L2 negotiated acquisition of the Loomis Property on Defendant's behalf, and ultimately the Partial Refund was paid to Defendant's Investor Entity, concealing the same from Walgreens.

95.    As a result of the undisclosed Partial Refund, on October 7, 2020, L2 was able to purchase the Loomis Property on behalf of Defendant for $3,630,858—$181,542 less than what

was represented to Walgreens in the ROFR Notice.  Walgreens relied on the fraudulent ROFR Notice and therefore did not exercise its ROFR.  But for the fraudulent representations in the ROFR Notice, Walgreens would have exercised its ROFR.

96.     Upon information and belief, there are numerous other instances of Defendant's Partial Refund scheme.

## V.     CAUSES OF ACTION

### COUNT ONE
### MISAPPROPRIATION OF TRADE SECRETS UNDER 18 U.S.C. § 1836

97.     Walgreens realleges each of the foregoing Paragraphs of this Complaint as if set forth herein.

98.     The Illegally Obtained Data was gathered, developed, and exclusively owned by Walgreens.

99.     The Illegally Obtained Data is comprised of highly confidential business and financial documents and information, including without limitation profit and loss information, store performance and revenue information, and compilations of such information.

100.    As more fully set forth above, Walgreens takes reasonable efforts to keep the Illegally Obtained Data secret by, without limitation, requiring Walgreens employees to be bound by the Walgreens Policies, restricting access to only those limited Walgreens employees with a Walgreens-related need for the information and documents, and permitting access for only Walgreens-related purposes.  Walgreens employees, like Peters, also received annual training from Walgreens' legal and/or compliance departments on the importance of maintaining confidentiality of Walgreens' confidential data, documents, and trade secrets and their obligations to maintain that confidentiality as Walgreens employees under the Walgreens Policies.

101.    The Illegally Obtained Data is not publicly available and is not readily ascertainable by anyone outside of Walgreens' employ.

102.    The confidentiality of the Illegally Obtained Data provides independent economic value because Walgreens uses it to analyze and make business decisions throughout the United States, including decisions relating to operations, commercial property purchasing, negotiation of lease terms, and whether to exercise Walgreens' ROFR in its leases, among other decisions.

103.    If an outsider or other entity obtained the trade secret and confidential information in the Illegally Obtained Data, they could use it to determine precisely how to make an offer to purchase Walgreens Properties that would effectively price Walgreens out of exercising its ROFR.

104.    Walgreens has never consented to Defendant acquiring, using, or disclosing the Illegally Obtained Data.

105.    Defendant knew or had reason to know that the Illegally Obtained Data contained in the pitch-decks was derived by improper means.  Defendant knew that L2's entire Acquisition Team was comprised of former Walgreens employees.  Further, as a sophisticated investor that had purchased dozens of commercial real estate properties, including pharmacies, Defendant was familiar with customs and practices in the pharmacy real estate industry—particularly, the secrecy of Walgreens store-performance data, such as store-by-store profit, total sales, store ranking, and especially the amount and type of prescription medications sold at an individual store.  Defendant was likewise made aware of the Illegally Obtained Data when L2 guaranteed through the Consulting Agreements that Walgreens would renew its lease.  Such a guarantee is unheard of, and Defendant would have known that L2 would not risk its consultation fee without insider information.  Upon information and belief, L2 informed Defendant of the improper acquisition of the Illegally Obtained Data during their pitch-deck meetings.  Defendant misappropriated

Walgreens' trade secrets by using the Illegally Obtained Data contained in the pitch-decks to determine the value of Walgreens Properties, decide whether to purchase Walgreens Properties, and determine the price to pay for such Walgreens Properties.

106.    Alternatively, Defendant is vicariously liable for L2's misappropriation of the Illegally Obtained Data.  Defendant retained L2 to acquire multiple Walgreens Properties pursuant to separate Consulting Agreements.  Pursuant to the Consulting Agreements, L2 agreed to provide data regarding Walgreens' stores (including the Illegally Obtained Data) and to search for and provide information regarding additional Walgreens Properties that matched Defendant's criteria. L2 then used the Illegally Obtained Data to identify properties for Defendant.   As L2 misappropriated the Illegally Obtained Data in the course of the very business that Defendant appointed L2 to perform, Defendant is vicariously liable for L2's misappropriation of the Illegally Obtained Data.

107.    As a direct and proximate result of Defendant's misappropriation of Walgreens' trade secrets, Walgreens has suffered damages in an amount to be determined at trial including, but not limited to, the lost opportunity to purchase properties under its ROFR, resulting in damages to Walgreens of at least $1,200,000.  Moreover, Walgreens is entitled to double its actual damages and attorneys' fees for the willful and malicious misappropriation of Walgreens' trade secrets pursuant to 18 U.S.C. § 1836(b)(3)(C) and (D).  Defendant is liable for these damages.

108.    In the alternative, Walgreens is entitled to a reasonable royalty for the unauthorized use and disclosure of Walgreens' trade secrets by Defendant.  Specifically, Walgreens is entitled to any profit that Defendant received from the operation of Walgreens Properties acquired through the misappropriation of Walgreens' trade secrets.

## COUNT TWO
## MISAPPROPRATION OF TRADE SECRETS UNDER THE UNIFORM TRADE SECRETS ACT

109.     Walgreens realleges each of the foregoing Paragraphs of this Complaint as if set forth herein.

110.     The Illegally Obtained Data is gathered, developed, and owned by Walgreens.

111.     Walgreens is an Illinois-based company.  Defendant resides and does business in Florida.

112.     The Illegally Obtained Data is comprised of highly confidential business and financial documents and information, including without limitation profit and loss information, store performance and revenue information, and compilations of such information.

113.     As more fully set forth above, Walgreens takes reasonable efforts to keep the Illegally Obtained Data secret by, without limitation, requiring Walgreens employees to be bound by the Walgreens Policies, restricting access to only those limited Walgreens employees with a Walgreens-related need for the information and documents, and permitting access for only Walgreens-related purposes.  Walgreens employees, like Peters, also received annual training from Walgreens' legal and/or compliance departments on the importance of maintaining confidentiality of Walgreens' confidential data, documents, and trade secrets and their obligations to maintain that confidentiality as Walgreens employees under the Walgreens Policies.

114.     The Illegally Obtained Data is not publicly available and is not readily ascertainable by anyone outside of Walgreens' employ.

115.     The confidentiality of the Illegally Obtained Data provides independent economic value because Walgreens uses it to analyze and make business decisions throughout the United States, including decisions relating to operations, commercial property purchasing, negotiation of lease terms, and whether to exercise Walgreens' ROFR in its leases, among other decisions.

116.    If an outsider or other entity obtained the trade secret and confidential information in the Illegally Obtained Data, such entity could use it to determine precisely how to make an offer to purchase the leased property that would effectively price Walgreens out of exercising its ROFR.

117.    Walgreens has never consented to Defendant acquiring, using, or disclosing the Illegally Obtained Data.

118.    As set forth above, Defendant in fact used the Illegally Obtained Data as part of his process for purchasing Walgreens' locations.

119.    As set forth in detail above, Defendant knew or had reason to know that the Illegally Obtained Data contained in the pitch-decks was derived by improper means.  Defendant misappropriated Walgreens' trade secrets by using the Illegally Obtained Data contained in the pitch-decks to decide whether to purchase Walgreens Properties and determine the price to pay for such Walgreens Properties

120.    Defendant knew or should have known that his actions would cause substantial harm or injury to Walgreens in Illinois.

121.    Walgreens in fact did suffer substantial harm or injury in Illinois.

122.    Alternatively, Defendant is vicariously liable for L2's misappropriation of the Illegally Obtained Data.  Defendant retained L2 to acquire multiple Walgreens Properties pursuant to separate Consulting Agreements.  Pursuant to the Consulting Agreements, L2 agreed to provide data regarding Walgreens stores (including the Illegally Obtained Data) and to search for and provide information regarding additional Walgreens Properties that matched Defendant's criteria. L2 then used the Illegally Obtained Data to identify properties that matched those criteria.  As L2 misappropriated the Illegally Obtained Data in the course of the very business that Defendant appointed L2 to perform, Defendant is vicariously liable for L2's misappropriation.

123.    By engaging in the misconduct described herein, Defendant has violated violated Illinois' version of the UTSA.  *See* 765 I.L.C.S. §§ 1065/2, 1065/4, & 1065/5.  In the alternative, Defendant's conduct violated the various versions of the UTSA adopted in the states where the Walgreens' Properties were located, including the states of Texas and Wisconsin.  *See* Tex. Civ. Prac. & Rem. Code Ann. § 134A.002; Wis. Stat. Ann. § 134.90.  As a final alternative, Defendant's conduct violated the version of the UTSA adopted in Florida.  See Fla. Stat. Ann. § 688.002.

124.    As a direct and proximate result of Defendant's misappropriation of Walgreens' trade secrets, Walgreens has suffered damages in an amount to be determined at trial including, but not limited to, the lost opportunity to purchase properties under its ROFR, resulting in damages to Walgreens of at least $1,200,000.  Walgreens is entitled to double the actual damages and attorneys' fees for the willful and malicious misappropriation of Walgreens' trade secrets.

125.    In the alternative, Walgreens is entitled to a reasonable royalty for the unauthorized use and disclosure of Walgreens' trade secrets by Defendant.  Specifically, Walgreens is entitled to any profit that Defendant received from the operation of Walgreens Properties acquired through the misappropriation of Walgreens' trade secrets.

## COUNT THREE
## UNJUST ENRICHMENT
### (In the Alternative to Counts One and Two)

126.    Walgreens realleges each of the foregoing Paragraphs of this Complaint as if set forth herein.

127.    Walgreens spent significant time and effort developing the Illegally Obtained Data. The Illegally Obtained Data is of significant value to Walgreens and its leaseholds.

128.    Defendant benefited from the use of Walgreens' Illegally Obtained Data.

129.    Defendant is aware that he benefited from the use of Walgreens' Illegally Obtained Data.

130.    As a result of Defendant's unlawful use of the Illegally Obtained Data, Defendant wrongfully obtained Walgreens Properties and has since profited off of those properties, both by the payments made by Walgreens as tenant and by any amounts made in the resale of those properties.

131.    Defendant will continue to profit off those properties for as long as he owns the illicitly-obtained Walgreens Properties and will further profit off of those properties when he sells them.

132.    Additionally, Defendant has obtained the Illegally Obtained Data, which is itself independently valuable, and has used it for his own gain.  Defendant will continue to profit from the use of the Illegally Obtained Data for the foreseeable future.

133.    It would be inequitable to allow Defendant to retain the benefit of the profit of Walgreens Properties and the use of the Illegally Obtained Data under these circumstances, where he has benefited from having the Illegally Obtained Data without providing any value to Walgreens in return.

134.    Walgreens is therefore entitled to any and all profits Defendant may have made off of the Walgreens Properties he purchased, including both the amount paid to Defendant by Walgreens as a tenant and any amounts paid to Defendant upon resale of the Walgreens Properties, amounts to be determined at trial.

135.    Walgreens is additionally entitled to punitive damages because Defendant engaged in intentional misconduct, with actual knowledge of the wrongfulness of his conduct and the high probability that injury or damage to Walgreens would result and, despite that knowledge,

intentionally pursued that course of conduct, or at a minimum, Defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of others.

## COUNT FOUR
## TORTIOUS INTERFERENCE WITH CONTRACT

136.    Walgreens realleges each of the foregoing Paragraphs of this Complaint as if set forth herein.

137.    Pursuant to the lease agreement with the landlords, Walgreens had a right to purchase Walgreens Properties on the same terms as those contained in the Bona Fide Offers. Moreover, landlords were prohibited from accepting a Bona Fide Offer without first giving Walgreens a true and correct copy of the Bona Fide Offer and allowing Walgreens the time to which it was entitled to decide whether to exercise its ROFR.

138.    Defendant is liable for tortious interference in acquiring Walgreens Properties.  As set forth above, Defendant and L2 targeted high-performing Walgreens properties and structured purchase offers to prevent Walgreens from exercising its ROFR through the use of the Illegally Obtained Data.

139.    Also as set forth above, before closing, L2 informed Defendant that he would receive undisclosed Partial Refunds for his purchases through pitch-decks.   Defendant's knowledge of the Partial Refund scheme may also be inferred through L2's contractual obligation to disclose all terms of each acquisition.

140.    Defendant has acted with malicious intent to induce landlords' breach of their leases with Walgreens, as evidenced by the following actions:

    a.    For at least the El Paso and Loomis Properties, but upon information and believe, other Walgreens Properties as well, Defendant induced the

landlords to breach the disclosure requirements in the ROFR provisions by concealing the Partial Refund terms from Walgreens; and

b.   Defendant targeted high-performing Walgreens properties and structured offers to prevent Walgreens from exercising its ROFR through the use of the Illegally Obtained Data.

141.   By providing funding for these transactions, Defendant is liable for tortious interference in acquiring the El Paso and Loomis Properties and effectively depriving Walgreens of its ROFR.

142.   Alternatively, Defendant is vicariously liable for L2's tortious interference.  L2's actions in concealing the Partial Refunds from Walgreens were taken on behalf of Defendant, who retained L2 to "negotiate acquisition" of Walgreens Properties.

143.   Defendant is therefore liable for L2's tortious interference in acquiring the El Paso and Loomis Properties.

144.   As a direct result of Defendant's actions, Walgreens has been damaged in an amount to be proven at trial.

145.   Walgreens is likewise entitled to injunctive relief to recover all properties conveyed to Defendant in violation of Walgreens' rights under its lease agreements, as any such conveyance is void.

146.   Walgreens is additionally entitled to punitive damages because Defendant engaged in intentional misconduct, with actual knowledge of the wrongfulness of his conduct and the high probability that injury or damage to Walgreens would result and, despite that knowledge, intentionally pursued that course of conduct, or at a minimum, Defendant's conduct was so

reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of others.

<u>**COUNT FIVE**</u>
**TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP**

147.    Walgreens realleges each of the foregoing Paragraphs of this Complaint as if set forth herein.

148.    Pursuant to lease agreements with the landlords, Walgreens had a business relationship with its landlords that afforded Walgreens certain prospective or existing legal and contractual rights.  Namely, pursuant to its ROFR, Walgreens had the right to enter into purchase and sale agreements with its landlords.

149.    By targeting high-performing Walgreens Properties and structuring sales using the Illegally Obtained Data, Defendant interfered with Walgreens' business relationships with its landlords and prevented it from consummating sales with its landlords pursuant to its ROFR.

150.    Defendant has acted with malicious intent to induce landlords not to enter into purchase and sale agreements with Walgreens pursuant to Walgreens' ROFR, as evidenced by the following actions:

> (a)    For at least the Walgreens Properties described herein, but upon information and belief, other properties as well, Defendant induced the landlords to breach the disclosure requirements in the ROFR provisions by concealing the Partial Refund terms from Walgreens; and

> (b)    Defendant targeted high-performing Walgreens Properties and structured offers to prevent Walgreens from exercising its ROFR through the use of the Illegally Obtained Data.

151.    As set forth above, before closing, L2 informed Defendant that it was using the Illegally Obtained Data to target and structure deals.  Alternatively, Defendant knew or should have known that the purchases of the Walgreens' properties involved the use of the Illegally Obtained Data.

152.    As set forth above, L2 informed Defendant that he would receive undisclosed Partial Refunds for his purchases through pitch-decks.

153.    Defendant's knowledge of the Partial Refund scheme may also be inferred through L2's contractual obligation to disclose all terms of each acquisition.

154.    By providing funding for these transactions and approving the Partial Refunds and the use of the Illegally Obtained Data, Defendant is liable for tortious interference in acquiring, at least, the Walgreens Properties described herein and effectively depriving Walgreens of its ability to enter into a purchase and sale agreement with its landlords.

155.    Alternatively, Defendant is vicariously liable for L2's tortious interference.  L2's actions in concealing the Partial Refunds and in using the Illegally Obtained Data were taken on behalf of Defendant, who retained L2 to negotiate acquisition of Walgreens Properties.

156.    As a direct result of Defendant's actions, Walgreens has been damaged in an amount to be proven at trial.

157.    Walgreens is likewise entitled to injunctive relief to recover all properties conveyed to Defendant in violation of Walgreens' rights to enter into purchase and sale agreements with its landlords, as any such conveyance is void.

152.    Additionally, Walgreens is entitled to punitive damages because Defendant's conduct is outrageous and is the result of the Defendant's evil or malicious motive or reckless indifference to the rights of others.

## COUNT SIX
## CONVERSION
### (In the Alternative to Counts One and Two)

153.     Walgreens realleges each of the foregoing Paragraphs of this Complaint as if set forth herein.

154.     As set forth above, Defendant received and continues to possess and retain the Illegally Obtained Data including, without limitation, the TTM document.

155.     Defendant has actual knowledge that the Illegally Obtained Data was wrongfully taken from Walgreens.  Defendant nonetheless has taken no steps to return the information to Walgreens.

156.     On the contrary, Defendant has used the Illegally Obtained Data to inform his decision to purchase various Walgreens Properties.

157.     Additionally, Defendant received and continues to possess and retain Walgreens Properties obtained using the Partial Refund scheme described above.

158.     Defendant has actual knowledge that the Partial Refund credits were wrongfully withheld in order to defraud Walgreens of its ROFR.  Defendant nonetheless continues to possess and retain the Walgreens Properties.

159.     As a result, Walgreens has been damaged in an amount to be determined at trial.

160.     Walgreens is additionally entitled to punitive damages because Defendant engaged in intentional misconduct, with actual knowledge of the wrongfulness of his conduct and the high probability that injury or damage to Walgreens would result and, despite that knowledge, intentionally pursued that course of conduct, or at a minimum, Defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of others.

## COUNT SEVEN
### FRAUD

161.    Walgreens realleges each of the foregoing Paragraphs of this Complaint as if set forth herein.

162.    As set forth above, Defendant and L2 agreed to use the Partial Refunds to fraudulently deceive Walgreens and prevent Walgreens from exercising its ROFR.

163.    Per the terms of the Consulting Agreements, Defendant specifically directed L2 to negotiate the purchase of Walgreens Properties on his behalf.  L2 kept Defendant informed of all material terms of those purchases.

164.    Defendant had actual knowledge that the Walgreens leases required the disclosure of all material terms of any offers to purchase the Walgreens Properties.

165.    Defendant likewise had actual knowledge that the Partial Refunds were not disclosed to Walgreens and that the purchase prices disclosed to Walgreens were false.

166.    Defendant also had actual knowledge that the purpose of the Partial Refunds was to convince Walgreens to rely on representations in ROFR Notices provided to Walgreens that the purchase prices offered for the Walgreens Properties were higher than they actually were.

167.    Nonetheless, Defendant and L2 agreed to use the Partial Refunds to defraud Walgreens and circumvent its ROFR.

168.    Defendant expressly approved of and directed L2 to proceed with the Partial Refund scheme to defraud Walgreens and obtain Walgreens Properties.

169.    L2, acting at Defendant's direction as Defendant's agent, then persuaded the landlords of the Walgreens Properties to not include the Partial Refund in the ROFR Notices sent to Walgreens.

170.    Walgreens reasonably relied on the representations made in the ROFR Notices it received regarding the purchase prices that had been offered for the Walgreens Properties in deciding not to exercise its ROFR.  Walgreens was therefore deprived of the opportunity to exercise its ROFR and purchase these Walgreens Properties.

171.    But for Defendant and L2's fraudulent statements in the ROFR Notices, Walgreens would have exercised its ROFR.

172.    As a result, Walgreens was damaged in an amount to be determined at trial.

173.    Walgreens is additionally entitled to punitive damages because Defendant engaged in intentional misconduct, with actual knowledge of the wrongfulness of his conduct and the high probability that injury or damage to Walgreens would result and, despite that knowledge, intentionally pursued that course of conduct, or at a minimum, Defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of others.

## COUNT EIGHT
## CONSPIRACY TO COMMIT FRAUD

174.    Walgreens realleges each of the foregoing Paragraphs of this Complaint as if set forth herein.

175.    As set forth above, Defendant and L2 agreed to use the Partial Refunds to fraudulently deceive Walgreens and prevent Walgreens from exercising its ROFR.

176.    Per the terms of the Consulting Agreements, Defendant specifically directed L2 to negotiate the purchase of Walgreens Properties on his behalf.  L2 kept Defendant informed of all material terms of those purchases.

177.    Defendant had actual knowledge that the Walgreens leases required the disclosure of all material terms of any offers to purchase the Walgreens Properties.

178.    Defendant likewise had actual knowledge that the Partial Refunds were not disclosed to Walgreens and that the purchase prices disclosed to Walgreens in the ROFR Notices were false.

179.    Defendant also had actual knowledge that the purpose of the Partial Refunds was to convince Walgreens to rely on representations in ROFR Notices provided to Walgreens that the purchase price offered for the Walgreens Properties was higher than it actually was.

180.    Nonetheless, Defendant and L2 agreed to use the Partial Refunds scheme to defraud Walgreens and circumvent Walgreens' ROFR.

181.    Defendant expressly approved of and directed L2 to proceed with the Partial Refund scheme to obtain Walgreens Properties.

182.    L2, acting at Defendant's direction, then persuaded the landlords of the Walgreens Properties to not include the Partial Refund in the ROFR Notices they sent to Walgreens.

183.    Walgreens reasonably relied on the representations made in the ROFR Notices it received regarding the purchase prices that had been offered for the Walgreens Properties in deciding not to exercise its ROFR.  Walgreens was therefore deprived of the opportunity to exercise its ROFR and purchase these Walgreens Properties.

184.    But for Defendant and L2's fraudulent statements in the ROFR Notices, Walgreens would have exercised its ROFR.

185.    As a direct result of L2 and Defendant's actions, Walgreens has been damaged in an amount to be proven at trial.

186.    Walgreens is additionally entitled to punitive damages because Defendant engaged in intentional misconduct, with actual knowledge of the wrongfulness of his conduct and the high probability that injury or damage to Walgreens would result and, despite that knowledge,

intentionally pursued that course of conduct, or at a minimum, Defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of others.

## COUNT NINE
## CONSPIRACY TO COMMIT CONVERSION
### (In the Alternative to Counts One and Two)

187.    Walgreens realleges each of the foregoing Paragraphs of this Complaint as if set forth herein.

188.     In addition to the foregoing, Defendant and L2 agreed to use the Illegally Obtained Data to target high-performing Walgreens stores.

189.    Defendant still possesses and retains the Illegally Obtained Data, including but not limited to information derived from the TTM.

190.    Defendant has actual knowledge that such information was wrongfully taken from Walgreens, and Defendant has taken no steps to return this information to Walgreens.

191.    As a direct result of L2 and Defendant's actions, Walgreens has been damaged in an amount to be proven at trial.

192.    Walgreens is additionally entitled to punitive damages because Defendant engaged in intentional misconduct, with actual knowledge of the wrongfulness of his conduct and the high probability that injury or damage to Walgreens would result and, despite that knowledge, intentionally pursued that course of conduct, or at a minimum, Defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of others.

## DEMAND FOR JURY TRIAL

193.    Walgreens demands a jury trial on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Walgreens respectfully requests this Court to:

a.     Award Walgreens a judgment against Defendant in the amount to be proven at trial;

b.     Award Walgreens double its actual damages and attorneys' fees for Defendant's willful and malicious misappropriation of Walgreens' trade secrets pursuant to 18 U.S.C. § 1836(3)(C) and (D), as well as the Uniform Trade Secrets Act, adopted by Illinois and any other applicable state;

c.     Award equitable relief, including but not limited to:

    i.     Disgorging all profits that Defendant obtained through the improper use and disclosure of the Illegally Obtained Data;

    ii.     Imposition of a constructive trust over any Walgreens Property that was acquired by Defendant through the use and disclosure of the Illegally Obtained Data; and

    iii.     Injunctive relief unwinding any conveyance where any landlord failed to comply with the terms of the ROFR provision of its lease with Walgreens;

d.     Award Walgreens its damages based on Defendant's tortious interference, unjust enrichment, conversion, and conspiracy to defraud Walgreens and convert its valuable trade secrets;

e.     Award Walgreens pre-judgment and post-judgment interest as permitted by any applicable law;

f.     Award Walgreens punitive damages because Defendant engaged in intentional misconduct, with actual knowledge of the wrongfulness of his conduct and the high probability that injury or damage to Walgreens would result and, despite that knowledge, intentionally pursued

that course of conduct, or at a minimum, Defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of others; and

g.      Award Walgreens such other and further relief as the Court may deem just and equitable.

Respectfully submitted this <u>19th</u> day of January, 2024.

<u>/s/ Michael S. French</u>
Michael S. French, Esq.
Florida Bar No. 1008237
Joseph D. Wargo, Esq.
Florida Bar No. 934194
WARGO, FRENCH, & SINGER LLP
1 Alhambra Plaza, Suite 1410
Coral Gables, Florida 33134
Telephone: (305) 777-6000
Facsimile: (305) 777-6001
Email: mfrench@wfslaw.com
jwargo@wfslaw.com
Service: flservice1@wfslaw.com


<u>/s/ David M. Pernini</u>
David M. Pernini, Esq. *pro hac vice application forthcoming*
WARGO, FRENCH, & SINGER LLP
999 Peachtree Street, NE, Suite 1120
Atlanta, Georgia 30309
Telephone: (404) 853-1500
Facsimile: (404) 853-1501
Email: dpernini@wfslaw.com

*Counsel for Plaintiff Walgreen Co.*